Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joshua D. Smith, Esq.
Colleen A. O'Neil, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                                   Docket No.: _____(        )

                                Plaintiffs,            **Plaintiffs Demand a Trial**
                                               **by Jury**

      -against-


BLISS DRUGS, INC., INNA ISKHAKOVA,
YVETTE DAVIDOV, AND JOHN DOE NOS. "1"
THROUGH "5",

                                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### <u>COMPLAINT</u>

     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Bliss Drugs, Inc., Inna Iskhakova,

Yvette Davidov, M.D., and John Doe Nos. "1" Through "5" (collectively, "Defendants"), hereby

allege as follows:

1.     This action seeks to terminate a fraudulent scheme perpetrated against GEICO by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $789,000 in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, over a thousand fraudulent charges seeking payment for medically unnecessary "pain relieving" prescription drug products, including topical compounded pain creams, topical pain gels and ointments, topical pain patches, as well as other medications (the "Fraudulent Pain Products") dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"), in order to exploit the Insureds for financial gain.

2.     As an essential part of the fraudulent scheme, Bliss Drugs, Inc. ("Bliss Drugs" or the "Pharmacy") and its owner, Inna Iskhakova ("Iskhakova") (collectively the "Pharmacy Defendants") engaged in illegal, collusive agreements with various prescribing healthcare providers, including Defendant Yvette Davidov, M.D. ("Davidov" or "Prescribing Defendant") who – without regard to genuine patient care – generated boilerplate, formulaic, illusory, and/or medically unnecessary prescriptions for pharmaceuticals, often using rubber stamps or preprinted template prescription forms created and supplied to them by the Pharmacy Defendants in violation of law.

3.     To effectuate the scheme and maximize profits, Bliss Drugs and Iskhakova cherry-picked a handful of medications to dispense to Insureds based solely on the medications' exorbitant pricing and high profit margins. Bliss Drugs and Iskhakova then arranged to have Davidov and other licensed physicians and physician's assistants (collectively the "Prescribing Physicians") steer prescriptions for these exorbitantly-priced medications to Bliss Drugs.

4.     As a further part of the fraudulent scheme, the Pharmacy Defendants arranged to have prescriptions steered from the Prescribing Physicians to Bliss Drugs for exorbitantly-priced compounded drug products (the "Fraudulent Compounded Pain Creams"). The Fraudulent Compounded Pain Creams are not approved by the United States Food and Drug Administration ("FDA") but are "creations" of Bliss Drugs, which it made by assembling combinations of multiple drug products with unproven effects in order to inflate the charges for and profits from these drug products. Bliss Drugs dispensed the Fraudulent Compounded Pain Creams in set formulations to Insureds without complying with state and federal licensing requirements designed to ensure the quality, safety, and effectiveness of the compounded drug products and without regard for genuine patient care.

5.     The scheme by the Pharmacy Defendants and the Prescribing Physicians to routinely prescribe and dispense large volumes of the Fraudulent Pain Products to patients pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO. For example, billing from the Pharmacy Defendants typically ranges from $1,289.08 to $1,329.72 for a single tube of Fraudulent Compounded Pain Cream. Similarly, the Pharmacy Defendants typically bill between $946.00 and $2,838.00 for a single diclofenac sodium transdermal gel 3% ("Diclofenac Gel") prescription and $1,520.00 for a single lidocaine 5% ointment ("Lidocaine 5% Ointment") prescription.

6.     The Defendants' scheme not only inflated the charges to insurers, but also posed serious risks to the patients' health, safety, and well-being, as the Fraudulent Pain Products were prescribed and dispensed without regard to genuine patient care, without regard to proper documentation by the prescribing professionals, and often in violation of state and federal licensing requirements.

7.      By this action, GEICO seeks to recover more than $90,000.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Bliss Drugs of over $450,000.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Bliss Drugs because:

    (i)    the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

    (ii)    The Defendants engaged in illegal, collusive relationships in which the Pharmacy Defendants solicited and received illegal prescriptions from the Prescribing Physicians and other Prescribing Physicians for the Fraudulent Pain Products in exchange for unlawful kickbacks and other financial incentives;

    (iii)    The Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pain Products pursuant to illegal, invalid, duplicitous, and formulaic prescriptions; and

    (iv)    Bliss Drugs engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on pharmacies, drug manufacturers, and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault benefits.

8.      The Defendants fall into the following categories:

    (i)    Bliss Drugs is a New York corporation that engaged in a fraudulent scheme in which it produced and dispensed in bulk the Fraudulent Pain Products to patients and then submitted bills to GEICO and other New York automobile insurers for reimbursement to which it is not entitled;

    (ii)    Iskhakova is the purported owner of Bliss Drugs;

    (iii)    Davidov is a medical professional who, in violation of New York law, entered into collusive arrangements with the Pharmacy Defendants whereby she prescribed, or purported to prescribe, the medically unnecessary Fraudulent Pain Products; and

    (iv)    John Doe Defendants "1" through "5" are persons and entities, presently not identifiable, who, along with the Pharmacy Defendants, participated in

the operation and control of Bliss Drugs, as well as facilitating the illegal, collusive relationships with the Prescribing Physicians.

9.      The Defendants' scheme began in 2017 and has continued uninterrupted to the present day. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants solicited and received illegal prescriptions from Davidov and other Prescribing Physicians for the Fraudulent Pain Products in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pain Products pursuant to illegal, duplicitous, and formulaic prescriptions; and (iv) Bliss Drugs engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements.

10.     Based on the foregoing, Bliss Drugs does not now have – and has never had – any right to be compensated for the Fraudulent Pain Products allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $90,000.00.

## THE PARTIES

I.      **Plaintiffs**

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.     **Defendants**

12.     Defendant Bliss Drugs is a New York corporation, incorporated on or about June 6, 2011, with its principal place of business at 47-01 Queens Boulevard, Sunnyside, New York.

13.     Bliss Drugs, through the present day, has knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

14.     Bliss Drugs engages in pharmaceutical compounding activities and specializes in producing and dispensing compounded pain creams.

15.     Bliss Drugs is registered with New York State as a pharmacy but is not registered as a manufacturer or outsourcing facility.

16.     Bliss Drugs is not permitted to engage in bulk compounding or specialize in dispensing large quantities of compounded pain creams that are not specially tailored to the needs of individual patients.

17.     Defendant Iskhakova resides in and is a citizen of New York. Iskhakova was licensed to practice pharmacy in New York on September 11, 2004. Iskhakova is listed as the owner of record for Bliss Drugs, and has been listed with the New York State Office of the Professions as the supervising pharmacist for Bliss Drugs.

18.     Defendant Davidov resides in and is a citizen of New Jersey. Davidov was licensed to practice medicine in New York on January 11, 2000. Davidov knowingly has participated in a scheme to prescribe the Fraudulent Pain Products to GEICO Insureds.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. §1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. §1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of New York's No-Fault Laws

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§65

et seq.)(collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

24.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

25.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

26.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals, relying on the implementing regulation, 11 N.Y.C.R.R. §65-3.16(a)(12), made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault benefits. The Court of Appeals further provided that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

27.     Pursuant to New York Insurance Law §403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   An Overview of Applicable Licensing Laws

28.    The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the United States Food and Drug Administration ("FDA") to oversee the safety of food, drugs, and cosmetics.

29.    Pursuant to New York Education Law §6808, no person, firm, corporation or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

30.    Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

31.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

32.    Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug

interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.     New York Education Law §6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions, while New York Education Law §6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

34.     New York Education Law §6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

35.     New York Education Law §6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

36.     New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

37.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

III.     **An Overview of Compounded Drug Products**

38.     The FDA strictly regulates drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

39.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (iii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

40.     Compounded drugs are not FDA-approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process which applies to new drugs -- but only under limited circumstances.  See 21 U.S.C. § 353a.

41.     In particular, pursuant to Section 503A of the Federal Food, Drug and Cosmetic Act ("FDCA"), as amended by the Compounding Quality Act, the laws applicable to drugs regulated by the FDA, including the laws relating to the safe manufacturing of drugs, generally do not apply to a "compounded" drug product: (1) if the drug product is compounded for an identified individual patient based on the receipt of a valid prescription order that a compounded product is necessary for the identified patient, and (2) if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

42.     The FDA defines traditional pharmacy compounding as the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription. Traditional pharmacy compounding plays a role in providing access to medications for patients with unique medical needs, which cannot otherwise be met with a commercially available product. State licensed pharmacies may compound

specified medications when an FDA-approved drug product is not available or appropriate for a patient, including strength or route of delivery.

43.     Unlike FDA-approved products, consumers and prescribers cannot assume that compounded drugs were made by validated processes in properly calibrated and cleaned equipment; that the ingredients in the drug were obtained from FDA-approved sources; that production personnel had the requisite knowledge and training; and that appropriate laboratory testing was performed to verify the compounded drug's potency, purity, quality, and safety.

44.     The FDA has publicly expressed concern regarding large-scale drug manufacturing under the guise of traditional small-scale pharmacy compounding. For example, the FDA has noted that poor practices on the part of bulk drug compounders can result in contamination or products that do not possess the strength, quality, and purity required. Published reports also consistently show that compounded drugs fail to meet specifications at a considerably higher rate than FDA-approved drugs.

45.     Traditional pharmacy compounding by state licensed pharmacies, therefore, is permissible when done on a small scale by pharmacists who prepare the medication based on an individual prescription. Specifically, when compounded drugs meet the requirements of 21 U.S.C. § 353a and are compounded to meet the particular needs of an individual patient, they can be exempted from the requirement, among others, that they be FDA-approved. See 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to ... this section is effective with respect to such drug").

46.     When Congress adopted 21 U.S.C. § 353a, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy,

while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.)(emphasis added).  As Congress stated at the time:

> the "exemptions in [this section] are limited to compounding for an individual patient based on the medical need of such patient for the particular drug compound. To qualify for the exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."

S. Rep. No. 105-43, at 67-68 (1997)(emphasis added).

47.     Because compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety and effectiveness of manufactured drug products, they should never be prescribed as a matter of routine therapy, and should only be prescribed to meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed.

48.     The prescription of compounded drug products and ensuing billing to both private and public insurers has been the subject of state and federal investigations and litigation due to increased concerns regarding fraud.  For example:

- in January 2014, the United States Attorney for the District of New Jersey obtained a guilty plea from a pharmacist who was involved with payment of kickbacks to a physician in exchange for prescriptions for compounded pain creams and gels.  See USA v. Kleyman, 1:14-CR-598-JHR, Docket No. 1.

- in February 2016, the United States Attorney for the Northern District of Texas indicted two laypersons, who conspired with physicians and pharmacies, in a scheme involving producing, prescribing, and distributing compound creams, including payment of kickbacks to Prescribing Physicians and insured beneficiaries.  See USA v. Cesario, 3:16-CR-060-M, Docket Nos. 3, 75.

- in June 2016, the United States Attorney for the Middle District of Florida indicted a physician who engaged in a fraudulent scheme involving payment of kickbacks for the referral of patients and prescriptions for compounded creams. See USA v. Baldizzi, 8:16CR271-MSS-AEP, Docket No. 1.

- in August 2016, the United States Attorney for the Southern District of New York indicted members of the Genovese, Gambino, Lucchese, and Bonanno crime families, whose alleged illegal activities included "causing…corrupt doctors to issue unnecessary and excessive prescriptions for expensive compound cream" billed to insurers. See USA v. Parrello, 16 Crim. 522 (2016).

49. Further, the U.S. Department of Health & Human Services ("USDHHS") and the U.S. Postal Service have both issued reports documenting fraud concerns with compounded drugs. See *High Part D Spending on Opioids and Substantial Growth in Compound Drugs Raise Concerns*, HHS OIG Data Brief, OEI-16-00290 (June 2016); *Worker's Compensation Compound Drug Costs, Management Advisory,* Report No. HR-MA-16-003 (March 14, 2016). Most recently, USDHHS issued a report entitled *Questionable Billing For Compounded Topical Drugs in Medicare Part D*, OEI-02-16-00440 (August 2018), which noted that many pharmacies in New York State are among the most questionable in the nation.

## IV. The Defendants' Scheme Involving The Fraudulent Pain Products

### A. Overview of the Scheme

50. Beginning in 2017, and continuing uninterrupted through the present day, the Pharmacy Defendants masterminded and implemented a fraudulent scheme in which they used Bliss Drugs to bill the New York automobile insurance industry for hundreds of thousands of dollars in inflated charges – which they were not eligible to receive – relating to the Fraudulent Pain Products purportedly provided to patients involved in automobile accidents.

51. As part of the Defendants' fraudulent scheme, the Pharmacy Defendants arranged to pay unlawful kickbacks, financial incentives, or other forms of compensation to the

Prescribing Physicians and the controllers of the No-Fault Clinics (the "Clinic Controllers") from which they operate in exchange for steering prescriptions to Bliss Drugs.

52.     Specifically, the unlawful kickbacks and other incentives were provided in exchange for having the Prescribing Physicians prescribe specific prescriptions drugs with exorbitant profit margins (i.e., the Fraudulent Pain Products) to Insureds, including topical compounded pain creams (i.e., the Fraudulent Compounded Pain Creams) and topical pain, gels, ointments, and patches, which in turn permitted the Pharmacy Defendants to bill GEICO for the Fraudulent Pain Products through Bliss Drugs.

53.     In keeping with the fact that Prescribing Physicians and Clinic Controllers steered prescriptions to the Pharmacy pursuant illegal, collusive arrangements, Iskhakova and Bliss Drugs provided the Prescribing Physicians with template prescription forms on Bliss Drugs letterhead that contained only a limited choice of exorbitantly-priced, high-margin prescription products.

54.     The Pharmacy Defendants dispensed and billed for the Fraudulent Pain Products to Insureds knowing that (i) the Fraudulent Pain Products are prescribed and dispensed pursuant to a predetermined protocol designed to exploit patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pain Products were the product of illegal, collusive arrangements – including the payment of cash or other financial incentives – intended to inflate the billing to insurers and financially enrich the Defendants; (iii) the Fraudulent Pain Products often have no proven efficacy and/or are often duplicative of other medications contemporaneously prescribed to the Insureds; and (iv) with respect to the Fraudulent Compounded Pain Creams, they were almost never prescribed properly in accordance with the governing state and federal regulations.

55.     In keeping with the fact that the Fraudulent Pain Products were prescribed pursuant to predetermined fraudulent protocols and illegal kickback arrangements in order to financially enrich the Defendants, the Prescribing Physicians never gave the prescriptions to the Insureds to fill (even though the prescriptions were paper prescriptions) and did not give the Insureds the option to use a pharmacy of their choosing.

56.     Rather, the Prescribing Physicians directed the prescriptions for the Fraudulent Pain Products to Bliss Drugs, notwithstanding that in many instances the No-Fault Clinics and the patients themselves were located far from Bliss Drugs and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

57.     In fact, virtually none of the GEICO Insureds who were purportedly dispensed Fraudulent Pain Products by Bliss Drugs live in Sunnyside, Queens, where the Pharmacy is located, and 85% of those Insureds actually live outside of Queens County entirely.

58.     The Prescribing Physicians directed and steered the prescriptions for the Fraudulent Pain Products to Bliss Drugs because the prescriptions were being issued pursuant to the illegal, collusive arrangements between Bliss Drugs and the Prescribing Physicians.

**B.      The Fraudulent Pain Products are Prescribed and Dispensed Without Regard to Genuine Patient Care**

59.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Physicians were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

60.     Conversely, the treatment reports almost uniformly reflected that the Insureds treated by the Prescribing Physicians did not get better, did not return to good health, and/or did

not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

61.     As part of the predetermined protocols, the Prescribing Physicians produced generic, preprinted, and boilerplate examination reports designed to justify continuing, voluminous, and excessive healthcare services that the No-Fault Clinic providers purported to render to Insureds, including the prescription of excessive and unnecessary pharmaceutical drug products.

62.     In keeping with the fact that that the Prescribing Physicians prescribed the Fraudulent Pain Products pursuant to the kickbacks paid by the Pharmacy Defendants, as well as predetermined treatment protocols, many of the Prescribing Physicians utilized template examination reports containing a short, pre-printed list of exorbitantly-priced, high-margin prescription products.

63.     Notwithstanding the creation of the examination reports, the Prescribing Physicians' prescriptions for the Fraudulent Pain Products were based on predetermined protocols, designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients, demonstrating a gross indifference to patient health and safety.

64.     The prescriptions routinely authorized by the Prescribing Physicians in exchange for kickbacks paid by the Pharmacy Defendants, and that enabled the Defendants to submit claims for reimbursement to GEICO and other insurers, primarily included exorbitantly-priced topical pain products, including gels, ointments, and patches, as well as compounded pain creams.

65.     Specifically, the Pharmacy Defendants routinely submitted claims pursuant to duplicitous prescriptions from several Prescribing Physicians for Diclofenac Gel and Lidocaine

5% Ointment, and pursuant to duplicitous prescriptions from Davidov for Compound NF #135, a compounded pain cream.

66.     Notably, in order for a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

67.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated – those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral nonsteroidal anti-inflammatory drugs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

68.     Despite this, the Prescribing Physicians virtually never documented in their examination reports whether oral medications were contraindicated for a particular patient.

69.     The Prescribing Physicians also did not document in their examination reports why the Fraudulent Pain Products prescribed were medically necessary.

70.     The Prescribing Physicians also continuously failed to document in their follow-up examination reports whether the Fraudulent Pain Products prescribed to a particular patient were actually used by the patient.

71.     The Prescribing Physicians also continuously failed to document in their follow-up examination reports whether the Fraudulent Pain Products provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

72.     The Pharmacy Defendants further failed to perform any legitimate prospective drug review regarding therapeutic duplication, drug-drug interactions, duration of drug

treatment, or clinical abuse or misuse before dispensing the Fraudulent Pain Products to Insureds.

>C.     **The Fraudulent Compounded Pain Cream Prescriptions**

73.     As part of their fraudulent, profit-driven scheme, the Defendants submitted or cause to be submitted, tens of thousands of dollars in claims for medically unnecessary, ineffective Fraudulent Compounded Pain Creams.

74.     Because compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products, they should never be prescribed as a matter of routine therapy, and should only be prescribed to meet a legitimate specific need of an individual patient.

75.     Bliss Drugs dispensed the Fraudulent Compounded Pain Creams, which are not FDA-approved, in predetermined set formulations, without tailoring the medications to the individual needs of an individual patient, and without complying with licensing requirements that are designed to ensure the quality, safety and effectiveness of bulk compounded drug products.

76.     Bliss Drugs, in order to generate profits, intentionally produced and dispensed the Fraudulent Compounded Pain Creams without regard for the absence of any proven efficacy of the combination of ingredients in a topical formulation.

77.     In an effort to conceal this fraudulent scheme, Bliss Drugs produced and dispensed the Fraudulently Compounded Pain Creams while concomitantly dispensing commercially, available, FDA-approved medications including oral non-steroidal anti-inflammatory drugs ("NSAIDs") and other topical pain medications.

78.     The Pharmacy Defendants then marketed these Fraudulent Compounded Pain Creams to various No-Fault Clinics that treated thousands of Insureds, and solicited the medical professionals operating therefrom, including Davidov, to prescribe the medically unnecessary and illusory Fraudulent Compounded Pain Creams to the Insureds. The Pharmacy Defendants then used those prescriptions to bill GEICO for the Fraudulent Compounded Pain Creams under the name of Bliss Drugs.

79.     In furtherance of the scheme, the Pharmacy Defendants provided the Prescribing Physicians with preprinted labels or rubber stamps which contain the names and the ingredients of the Fraudulent Compounded Pain Creams, including the percentage concentrations of each ingredient used. The Pharmacy Defendants provided the Prescribing Physicians with preprinted labels and rubber stamps in order to make it as convenient as possible for the Prescribing Physicians to authorize as many prescriptions as possible for the Fraudulent Compounded Pain Creams.

80.     The Prescribing Physicians then used the preprinted labels or rubber stamps on their official New York State prescription pads to prescribe the Fraudulent Compounded Pain Creams to the Insureds, which were then created, produced, and dispensed by the Pharmacy Defendants.

81.     The Fraudulent Compounded Pain Cream Davidov typically prescribed is Compound NF #135.

82.     A representative sample of Bliss Drugs' bills and the accompanying prescriptions for Compound NF #135 issued by Davidov using a rubber stamp, and which the Defendants submitted or caused to be submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "2".

83.     Davidov and other Prescribing Physicians often recommended Insureds continue taking oral NSAIDs (e.g., ibuprofen and naproxen) and/or prescribed oral NSAIDs contemporaneous to prescribing Fraudulent Compounded Pain Creams, which is known as duplication of therapy. Duplication of therapy can cause adverse events to the patient and very often leads to emergency room visits because the use of more than one medication in the same class of drugs exacerbates the possible adverse side effects.

84.     Notably, the examination reports submitted by Davidov to GEICO virtually never contained any explanation as to why the compounded drug product was medically necessary to meet the unique needs of an individual Insured.

85.     Moreover, Davidov's follow-up examination reports virtually always failed to explain whether the Compound NF #135 was effective or whether the patient experienced any side effects. In fact, the follow-up examination reports routinely failed to even reference the fact that Compound NF #135 was prescribed to the patient.

86.     The Pharmacy Defendants used these fraudulent prescriptions from Davidov and other Prescribing Physicians to bill GEICO and other insureds thousands of dollars for the Fraudulent Pain Products, including the Fraudulent Compounded Pain Creams.

87.     Bliss Drugs typically billed GEICO $1,097.88 to $1,289.08 for a single tube of Compound NF #135.

88.     The Defendants submitted these exorbitant charges knowing that the topical efficacy of the Fraudulent Compounded Pain Creams that Bliss Drugs produced and dispensed was unproven, and that there are a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

89.     Defendants knew that there was no legitimate medical need for the Fraudulent Compounded Pain Creams that could explain why a commercially available drug product alone would not be appropriate for the patients who were instead prescribed and dispensed the exorbitantly-priced Fraudulent Compounded Pain Creams in addition to such commercially available products.

90.     The Pharmacy Defendants, solely to maximize profits, caused Bliss Drugs to specialize in illegal compounding, producing large quantities of compounded drugs in set formulations, as part of the collusive agreements made with the Prescribing Physicians to compound and dispense specially marked, formulaic prescriptions.

91.     The Fraudulent Compounded Pain Creams produced by Bliss Drugs: (i) were not medically necessary; (ii) contained combinations of ingredients that produced no significant difference between the compounded drug and comparable, commercially available products; (iii) were almost never prescribed properly under the governing regulations; and (iv) were "prescribed" and produced in large quantities without regard to medical necessity or the regulations governing the appropriate use of compounded drug products, as part of unlawful arrangements with the Prescribing Physicians, including Davidov.

92.     In short, the Fraudulent Compounded Pain Creams produced by Bliss Drugs and prescribed by the Prescribing Physicians working in collusion with Bliss Drugs, including Davidov, served no purpose other than to exploit the Insured's No-Fault benefits so as to financially benefit the Defendants.

1. **Bliss Drugs Specialized in Large Scale Drug Compounding Activity in Violation of New York State and Federal Law Governing Drug Manufacturers and Outsourcing Facilities**

93.     As stated above, compounded drug products are only appropriate in limited circumstances, should be formulated for an individual patient's needs upon receipt of a valid prescription for an identified individual or a notation on a prescription stating that a compounded product is necessary for the identified patient, and should not be prescribed and dispensed as a matter of routine therapy. Moreover, compounded drug products should never replace an FDA-approved and commercially available pharmaceutical product that can fulfill the same pharmacological need for the patient.

94.     The Pharmacy Defendants, however, blatantly exploited the No-Fault insurance reimbursement system by entering into collusive relationships with the Prescribing Physicians involving the marketing and soliciting of prescriptions for the same predetermined Fraudulent Compounded Drugs that were dispensed again and again to numerous Insureds involved in minor fender-bender type accidents, generating millions of dollars in fraudulent billing to New York automobile insurers.

95.     Bliss Drugs, acting under the guise of a neighborhood pharmacy, intentionally assembled combinations of expensive drug ingredients solely to produce exorbitantly-priced Fraudulent Compounded Pain Creams that it could use to generate huge volumes of inflated billing, as part of collusive, steering relationships with the Prescribing Physicians.

96.     As stated above, in furtherance of the scheme, the Pharmacy Defendants gave the Prescribing Physicians preprinted labels or rubber stamps setting forth the predetermined, preformulated Fraudulent Compounded Pain Creams that Bliss Drugs created, and/or a series of

preprinted labels or rubber stamps, including the designated formulation, the names of the particular drug ingredients, and the percentage concentrations of each ingredient used.

97. For example, the Pharmacy Defendants produced, marketed, and dispensed, among others, Compound NF #135, a predetermined, formulaic Fraudulent Compounded Pain Cream which Davidov and other Prescribing Physicians typically prescribed using a rubber stamp given to her by the Pharmacy Defendants. Compound NF #135 contains:

- Meloxicam 2%
- Baclofen 4%
- Gabapentin 4%
- Diclofenac 5%
- Cyclobenzaprine 2%

98. As noted above, Bliss Drugs typically billed between $1,097.88 to $1,289.08 for a single tube of Compound NF #135.

99. The combination of drugs used in the Fraudulent Compounded Pain Creams is merely a means for the Defendants to inflate the billing and maximize their charges to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product. As a result, the more constituent drug ingredients that Bliss Drugs includes in its Fraudulent Compounded Pain Creams, the more that the Pharmacy Defendants can bill under the name of Bliss Drugs.

100. Further, despite the fact that, according to the FDA, traditional pharmacy compounding requires the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription, the prescriptions using preprinted labels and/or rubber stamps indicate that the Pharmacy Defendants create predetermined compounded drug products that are produced in bulk.

101.    Additionally, by including both Meloxicam and Diclofenac -- two different NSAIDs -- in every preformulated tube of Compound NF #135, the Pharmacy Defendants engaged in duplication of therapy whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received the Fraudulent Compounded Cream.

102.    Similarly, by including both Baclofen and Cyclobenzaprene -- two different muscle relaxers -- in every preformulated tube of Compound NF #135, the Pharmacy Defendants engaged in duplication of therapy whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received the Fraudulent Compounded Cream.

103.    The preformulated Fraudulent Compounded Pain Creams were not created or prescribed by the Prescribing Physicians to meet the unique needs of any individual patient.

104.    The Fraudulent Compounded Pain Creams were produced and dispensed by Bliss Drugs in large quantities without regard to the unique needs of any individual patient.

105.    Notably, the Pharmacy Defendants never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that would explain why a commercially available drug product was not appropriate to dispense to the Insureds who received the Fraudulent Compounded Pain Creams.

106.    Likewise, the Prescribing Physicians, including Davidov, never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that would explain why a commercially available drug product was not appropriate to prescribe for the Insureds who received the Fraudulent Compounded Pain Creams. For example, the Prescribing Physicians never indicated the patient had a contraindication to commercially available drug products, and rarely did they document any medication allergies or pre-existing comorbidities that might support the use of Fraudulent Compounded Pain Creams.

107.     Accordingly, the Fraudulent Compounded Pain Creams, prescribed by the Prescribing Physicians and produced by the Pharmacy Defendants, were never customized for individual patients.

108.     The Fraudulent Compounded Pain Creams varied only in that there were a limited number of predetermined Fraudulent Compounded Pain Creams from which to choose.

109.     Bliss Drugs, by specializing in creating and dispensing large volumes of the Fraudulent Compounded Pain Creams, engaged in bulk compounding activity (akin to that engaged in by drug manufacturers and outsourcing facilities) as opposed to compounding individual prescriptions on a case-by-case basis upon receipt of a valid prescription order.

110.     Bliss Drugs' bulk compounding activity required it to register as a manufacturer or outsourcing facility with the New York State Department of Education, as well as with the FDA, rather than registering as a mere pharmacy.

111.     The Pharmacy Defendants' creation and dispensation of predetermined, compounded drug products in large volumes, renders Bliss Drugs in violation of both state and federal licensing laws regulating the safe manufacturing of drugs.

112.     Bliss Drugs and the Fraudulent Compounded Pain Creams are not exempt from FDA oversight and approval, and from similar New York State licensing requirements applicable to drug manufacturers and outsourcing facilities, because the Fraudulent Compounded Pain Creams were illegally compounded in set formulations in large quantities, rather than individualized and tailored to meet specific individual patient needs and provided pursuant to legitimate prescriptions.  See 21 U.S.C. § 355 and 21 U.S.C. 353a(a).

113.     Furthermore, as drug manufacturers and dispensers, the Pharmacy Defendants violated 21 U.S.C. § 355(a) which states that "no person shall introduce or deliver for

introduction into interstate commerce any new drug" without first obtaining approval to do so by way of an application filed with the Secretary of Health and Human Services with respect to that drug.

114. A "new drug" – as defined by 21 U.S.C. § 321(p)(1) – is "any drug…the composition of which is such that such drug is not generally recognized…as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

115. Bliss Drugs's Fraudulent Compounded Pain Creams – for which it has billed GEICO in tens of thousands of dollars – have never been FDA-approved and, therefore, were never verified by the FDA as being safe, effective, or quality products. In fact, Bliss Drugs's bulk compounding and dispensing of the Fraudulent Compounded Pain Creams exposed Insureds to widespread risks including harmful contraindications, which is why they should only be prescribed under unique circumstances in limited circumstances.

## 2. Bliss Drugs Specialized in Large Scale Drug Compounding Activity in Violation of New York State and Federal Law Governing Drug Manufacturers and Outsourcing Facilities

116. In keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to the Defendants' fraudulent scheme intended to generate profits from insurers, Bliss Drugs' Fraudulent Compounded Pain Creams (i) have no medical efficacy based on the purported symptoms of the patients receiving the compounded product and (ii) were prescribed without any legitimate reason to provide the patients with expensive compounded products – which include drugs whose efficacy in topical form is undocumented and unsupported – when there are many other widely accepted, proven effective alternatives with well-documented therapeutic benefits commercially available at considerably lower costs.

117.    Evidence-based guidelines for the treatment of acute pain do exist and should always guide prescribing habits. The World Health Organization ("WHO") pain relief ladder recommends an orally-administered non-opioid such as acetaminophen or a nonsteroidal anti-inflammatory drug ("NSAID") for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers, and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use. Clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries) in superficial locations.

118.    Because compounded products, like the ones dispensed by Bliss Drugs are not FDA-approved – and therefore not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products – they should never be prescribed as routine therapy. Rather, they should only be prescribed to meet a legitimate specific need of an individual patient.

119.    In keeping with the fact that the prescriptions for the Fraudulent Compounded Pain Creams were not prescribed to meet legitimate specific need of individual patients but rather were prescribed as part of routine therapy, the Insureds in the claims set forth in Exhibit "1" virtually always suffered garden-variety soft tissue injuries such as sprains or strains, to the extent they suffered any injuries at all.

120.    Ordinary soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all. It is highly improbable that a

compounded drug product would be necessary to treat a soft tissue injury several months after an Insureds' car accident.

121.   It is even more improbable – to the point of impossibility – that a compounded drug product would be necessary to treat a soft tissue injury several months after an Insured's car accident for a substantial majority of Insureds who purportedly received treatment from Davidov and other Prescribing Physicians at the No-Fault Clinics.

122.   However, a substantial amount of Insureds that received treatment from Davidov and other Prescribing Physicians at the No-Fault Clinics for soft tissue injuries resulting from minor automobile accidents received a prescription -- and frequently multiple prescriptions -- for Fraudulent Compounded Pain Creams several months after their automobile accidents.

123.   Moreover, even in the rare event that an Insured receiving treatment from Davidov or another Prescribing Physician at the No-Fault Clinics continued to experience significant pain months after that Insured's alleged automobile accident, there is no evidence supporting the prescription of the Fraudulent Compounded Pain Creams to resolve that pain.

124.   In order for a topical formulation to be effective, it must be able to penetrate the skin so that it can reach the nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

125.   The skin is composed of three layers: epidermis, dermis, and hypodermis. Within the epidermis, the stratus corneum is the outermost layer of the skin that serves as the main barrier to drug entry. For analgesic medicines to be absorbed through the skin, they must contain optimal drug combinations, effective concentrations of each drug, and a compounding base with the appropriate physiochemical properties to facilitate absorption. In general, creams are less effective than gels or sprays in penetrating the skin.

126. Moreover, in almost all scenarios, oral pain relievers are superior to all topical formulations because they reduce or alleviate pain by entering the bloodstream through the gastrointestinal system making travel to the relevant nerve or tissue receptors easy.

127. Some of the limited circumstances in which a physician should prescribe a topical medication instead of oral pain relievers include for patients in whom these oral medications are contraindicated such as those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral nonsteroidal anti-inflammatory drugs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

128. Bliss Drugs' Fraudulent Compounded Pain Creams contain combinations of drugs that make no clinical sense and have no efficacious value in treating musculoskeletal and neuropathic injuries – even assuming that the Insureds treated by the Prescribing Physicians actually suffered from such injuries.

129. There are no published, peer-reviewed, controlled studies to support that patients who suffer from musculoskeletal pain or neuropathy have achieved any therapeutic effect from using topical pain creams containing the drugs that are part of the Fraudulent Compounded Pain Creams.

130. Further, many of the Fraudulent Compounded Pain Creams are available in alternative oral formulations or are commercially available in different topical formulations at a fraction of the cost.

131. The alternatives to the Fraudulent Compounded Pain Creams, whether in oral formulations or commercially available topical formulations at fraction of the cost, have proven to therapeutically benefit patients with musculoskeletal and neuropathic pain, are FDA-approved,

and are commonly prescribed by healthcare providers who utilize evidence-based medicine for their prescribing practices.

132.    Even so, in keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to predetermined protocols without regard to genuine patient care, the Pharmacy Defendants frequently purported to dispense identical Fraudulent Compounded Pain Creams pursuant to prescriptions from the Prescribing Physicians to multiple Insureds involved in the same underlying accident regardless of their different physical conditions, different injuries, if any, and different individual needs:

133.    For example:

(i)      On September 15, 2018, two Insureds – RB and MB – were involved in the same minor automobile accident. RB and MB were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RB and MB suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, RB and MB were both prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(ii)     On December 24, 2017 two Insureds – TI and BS – were involved in the same minor automobile accident. TI and BS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that TI and BS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, TI and BS were both prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(iii)    On December 16, 2017 three Insureds – AG, CG, and AD – were involved in the same minor automobile accident. AG, CG, and AD were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AG, CG, and AD suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, AG, CG, and AD were all prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact

that they were differently situated.

(iv)     On March 23, 2019 two Insureds – VG and IG – were involved in the same minor automobile accident. VG and IG were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that VG and IG suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, VG and IG were both prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(v)      On May 7, 2018 two Insureds – CS and JR – were involved in the same minor automobile accident. CS and JR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that CS and JR suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, CS and JR were both prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(vi)     On February 8, 2019 two Insureds – MA and JG – were involved in the same minor automobile accident. MA and JG were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MA and JG suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, MA and JG were both prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(vii)    On December 27, 2016 two Insureds – JT and VS – were involved in the same minor automobile accident. JT and VS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JT and VS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, JT and VS were both prescribed identical Fraudulent Compounded Pain Creams that were dispensed by the Pharmacy, despite the fact that they were differently situated.

134.    These are only representative examples. In the claims for Fraudulent Compounded Pain Creams that are identified in Exhibit "1", the Pharmacy Defendants

frequently dispensed identical Fraudulent Compounded Pain Creams to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

135. When prescribing the Fraudulent Compound Pain Cream, the Prescribing Physicians, including Davidov, did not document in their examination reports whether the patients were intolerant of commercially available products, or whether any commercially available products were recommended to the patient.

136. The Prescribing Physicians, including Davidov, also failed to document in their examination reports any contraindication to oral NSAIDs or why a compounded topical drug product was medically necessary for a specific patient. They also failed to document why the particular Fraudulent Compounded Pain Cream – typically NF #135 – was medically necessary for a specific patient.

137. Moreover, the Prescribing Physicians, including Davidov, also failed to document in their follow-up examination reports: (i) whether the Fraudulent Compounded Pain Cream prescribed to a particular patient was actually used by the patient; or (ii) whether, if used, the Fraudulent Compounded Pain Cream provided any pain relief to the patient or was otherwise effective for the purpose prescribed.

138. The Prescribing Physicians, including Davidov, plainly and continuously failed to prescribe individually tailored compounded products, made for identified individual Insureds, and capable of producing a significantly better result than a comparable, commercially available product.

139. Likewise, Bliss Drugs plainly and continuously failed to dispense individually tailored compounded products, made for identified individual Insureds, and capable of producing a significantly better result than a comparable, commercially available product.

140.    Contrary to evidenced-based medical practices, the Prescribing Physicians, including Davidov, routinely prescribed the Fraudulent Compounded Pain Cream months after individual Insured's alleged automobile accidents and without regard to whether other forms of oral and/or topical medications approved for the treatment of pain were available for the individual Insureds, and the Pharmacy Defendants routinely filled the Fraudulent Compounded Pain Cream prescriptions months after individual Insured's alleged automobile accidents and without regard to whether other forms of oral and/or topical medications approved for the treatment of pain were available for the individual Insureds.

141.    The Prescribing Physicians, including Davidov, wrote the prescriptions for the Fraudulent Compounded Pain Cream and the Pharmacy Defendants filled the Fraudulent Compounded Pain Cream prescriptions pursuant to the  illegal, collusive arrangement entered into between the Pharmacy Defendants and the Prescribing Physicians that employed fraudulent predetermined treatment and billing protocols designed to enrich all of the Defendants.

### D.    **The Fraudulent Charges for Diclofenac Gels**

142.    As a further part of the fraudulent scheme, the Pharmacy Defendants routinely billed GEICO for exorbitantly-priced diclofenac sodium 3% gel (i.e., Diclofenac Gel), pursuant to prescriptions purportedly authorized by various medical professionals operating from numerous No-Fault Clinics, including, in particular, Carline Boubert, P.A. ("Boubert").

143.    The Defendants solicited the Prescribing Physicians and the Clinic Controllers to provide them with voluminous prescriptions for Diclofenac Gel because the Defendants could readily buy Diclofenac Gel at low cost and then have Bliss Drugs bill GEICO and other New York No-Fault insurers huge sums.

144.    Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

145.    Diclofenac sodium 3% gel, i.e., the Diclofenac Gel prescribed by the Prescribing Physicians and dispensed by the Pharmacy Defendants, is typically used to treat a skin condition known as actinic keratoses.

146.    Diclofenac sodium 3% gel (i.e., Diclofenac Gel) has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac sodium 3% gel to treat musculoskeletal injuries an accepted off-label use.

147.    The Prescribing Physicians, including Boubert, routinely prescribed diclofenac sodium 3% gel and the Pharmacy Defendants routinely dispensed these Diclofenac Gels, despite the fact that none of the Insureds suffered from actinic keratoses, and despite the fact that there is no proven efficacy or safety associated the use of diclofenac sodium 3% gel to treat musculoskeletal injuries.

148.    The United States Food and Drug Administration ("FDA") requires that all diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

149.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

150.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii)

diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

151.    Even so, in keeping with the fact that the Diclofenac Gels were prescribed pursuant to predetermined protocols without regard to genuine patient care, the Pharmacy Defendants frequently purported to dispense identical Diclofenac Gels pursuant to prescriptions from the Prescribing Physicians to two or more Insureds who were involved in the same underlying accident, regardless of their different physical conditions, different injuries, if any, and different individual needs.

152.    For example:

(i)     On October 22, 2019, two Insureds – JW and KK – were involved in the same minor automobile accident. JW and KK were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JW and KK suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, JW and KK were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(ii)    On June 12, 2018, three Insureds – MH, CG, and CR – were involved in the same minor automobile accident. MH, CG, and CR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MH, CG, and CR suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, MH, CG, and CR were all prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(iii)   On July 10, 2018, two Insureds – MB and BM – were involved in the same minor automobile accident. MB and BM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MB and BM suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, MB and BM were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

Case 1:20-cv-04989-FB-SJB   Document 1   Filed 10/16/20   Page 37 of 65 PageID #: 37

(iv)     On May 7, 2018 two Insureds – LR and KD – were involved in the same minor automobile accident. LR and KD were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that LR and KD suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, LR and KD were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(v)     On August 22, 2018, two Insureds – JV and DV – were involved in the same minor automobile accident. JV and DV were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JV and DV suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, JV and DV were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(vi)     On August 5, 2018, two Insureds – EP and SS – were involved in the same minor automobile accident. EP and SS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that EP and SS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, EP and SS were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(vii)     On April 25, 2019, two Insureds – MR and AA – were involved in the same minor automobile accident. MR and AA were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MR and AA suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, MR and AA were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(viii)     On August 2, 2018, two Insureds – AR and DG – were involved in the same minor automobile accident. AR and DG were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AR and DG suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, AR and DG were both prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(ix)     On June 4, 2018, <u>four</u> Insureds – FP, DP, EB, and VP – were involved in the same

minor automobile accident. FP, DP, EB, and VP were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that FP, DP, EB, and VP suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, FP, DP, EB, and VP were all prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

(x)   On January 3, 2019, four Insureds – JL, BN, CL, and BJS – were involved in the same minor automobile accident. JL, EB, CL, and BJS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JL, EB, CL, and BJS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative examinations by one of the Prescribing Physicians, JL, EB, CL, and BJS were all prescribed identical Diclofenac Gels that were dispensed by the Pharmacy, despite the fact that they were differently situated.

153.   These are only representative examples. In the claims for Fraudulent Compounded Pain Creams that are identified in Exhibit "1", the Pharmacy Defendants frequently dispensed identical Diclofenac Gels to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

154.   Notwithstanding the proper and common uses for Diclofenac Gel, or the risks associated with the drug, the Defendants steered the Prescribing Physicians to prescribe diclofenac sodium in the form of Diclofenac Gels, while oftentimes recommending the patient continue the use of oral NSAIDs, such as ibuprofen and naproxen, or simultaneously prescribing oral NSAIDs and other topical pain products including Lidocaine 5% Ointment and Lidocaine Patches.

155.   Prescribing Diclofenac Gels, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

156.    Nevertheless, the Prescribing Physicians consciously prescribed and the Defendants consciously dispensed Diclofenac Gels in conjunction with oral NSAIDs and/or other Fraudulent Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being.

157.    For example, the Prescribing Physicians, including Boubert, simultaneously prescribed Diclofenac Gels and oral NSAIDs on the exact same date to, among others, the following Insureds:

(i)      WA;

(ii)     EA;

(iii)    CA;

(iv)     JB;

(v)      EB;

(vi)     CB;

(vii)    JB;

(viii)   FC;

(ix)     DC;

(x)      AC;

(xi)     RD;

(xii)    JD;

(xiii)   LE;

(xiv)    LE;

(xv)     DG

(xvi)    PG;

(xvii)   RG;

(xviii)  KG;

(xix)    YG;

(xx)     AG;

(xxi)    MH;

(xxii)   MH-S;

(xxiii)  MI;

(xxiv)   JJ; and

(xxv)    AJ

158.    The Pharmacy Defendants then simultaneously dispensed the Diclofenac Gels and the oral NSAIDS to the Insureds identified above, among others, on the exact same date, without counseling the Insureds regarding the risks or dangers associated with the concurrent use of Diclofenac Gel and oral NSAIDs.

159.    In the instant matter, by engaging in such therapeutic duplication, the Prescribing Physicians and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

160.    The Diclofenac Gels were prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

161.    In keeping with the fact that Diclofenac Gels were prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the

initial examination reports prepared by the Prescribing Physicians virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed diclofenac sodium.

162.     In further keeping with the fact that the Diclofenac Gels were prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Physicians virtually never addressed whether the Diclofenac Gels prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

163.     Bliss Drugs typically billed GEICO between $1,892.00 and $2,838.00 for a single tube of Diclofenac Gel.

164.     In further keeping with the fact that Diclofenac Gel was prescribed and dispensed pursuant to maximize profit and without regard for patient care, the Prescribing Physicians never prescribed topical diclofenac sodium in concentrations less than 3%, despite the fact that such prescriptions present less risk of adverse cardiovascular and gastrointestinal events, result in significantly lower charges to insurers, have some demonstrated efficacy and safety in treating certain musculoskeletal conditions, and would constitute a more conservative course of treatment.

165.     Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same

report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

### E.    The Fraudulent Charges for Lidocaine 5% Ointment and Patches

166.    In addition to the egregious amount of Diclofenac Gel prescribed and dispensed by the Defendants to Insureds, the Pharmacy Defendants also submit exorbitant claims -- predicated on prescriptions from the Prescribing Physicians -- for various other Fraudulent Pain Products, including Lidocaine 5% Ointments and lidocaine 5% patches ("Lidocaine Patches") (collectively the "Lidocaine Products").

167.    The Pharmacy Defendants typically charged between $1,216.00 and $1,900.00 for a single Lidocaine 5% Ointment prescription and $280.00 for a 30-day supply of Lidocaine Patches.

168.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

169.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin. Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain, nor is it indicated for this type of condition.

170.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be

instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

171.   Despite this, the Prescribing Physicians never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Physicians routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to Bliss Drugs.

172.   For example, the Prescribing Physicians never recommended insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of approximately $10.00 or less..

173.   In keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Physicians and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions, like the Diclofenac Gel prescriptions, were often issued contemporaneous to oral NSAIDs and/or other Fraudulent Pain Products such as topical pain patches.

174.   As with the prescriptions for Diclofenac Gel, the initial examination reports prepared by the Prescribing Physicians virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Lidocaine 5% Ointment.  Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any

pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

175.    As a further part of the scheme, Bliss Drugs also frequently billed GEICO for exorbitantly-priced pain patches – primarily in the form of lidocaine 5% patches (i.e., "Lidocaine Patches"), pursuant to duplicitous prescriptions solicited from the Prescribing Physicians and the Clinic Controllers in exchange for kickbacks or other incentives.

176.    In keeping with the fact that the Defendants steered the Prescribing Physicians to prescribe the Fraudulent Pain Products pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Lidocaine Patches were routinely dispensed and billed at exorbitant prices despite the availability of less expensive, commercially available FDA-approved patches.

177.    Notably, Lidocaine Patches are primarily used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the Lidocaine Patches themselves.  In fact, Lidocaine Patches are insufficient to produce a complete sensory block.

178.    Nevertheless, the Prescribing Physicians routinely prescribed these patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

179.    The Lidocaine Patches were routinely prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms.

180.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Physicians never recommended Insureds first use over-the-counter lidocaine products – which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements

and predetermined protocols, the Prescribing Physicians routinely prescribed Insureds Lidocaine Patches.

181.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Physicians virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Lidocaine Patches. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

182.    The Defendants' egregious billing coupled with the fact that the Prescribing Physicians failed to properly document – or even document at all – the prescriptions for Diclofenac Gel and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Physicians to have prescribed large volumes of these medications to the Insureds, or for Bliss Drugs to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

F.    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Between the Pharmacy Defendants and the Prescribing Physicians**

183.    To effectuate the fraudulent scheme, the Defendants participated in illegal, collusive arrangements in which the Pharmacy Defendants solicited from the Clinic Controllers and the Prescribing Physicians prescriptions for a targeted set of prescription drugs (i.e., the Fraudulent Pain Products) without regard for genuine patient care, in violation of New York law.

184. New York's statutory framework provides, among other things, that physicians and physician's assistants are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

185. New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See Education Law § 6530(38) and § 6811(7). In fact, New York Education Law § 6811(7) makes such agreements criminal.

186. Here, the Pharmacy Defendants arranged with the Clinic Controllers and the Prescribing Physicians working at various No-Fault Clinics, which treat thousands of Insureds to have the Prescribing Physicians, prescribe, or purport to prescribe, the Fraudulent Pain Products, including the Fraudulent Compounded Pain Creams, the Diclofenac Gels, and the Lidocaine Products, which in turn permitted the Pharmacy Defendants to bill GEICO for large sums under the name of Bliss Drugs.

187. In furtherance of the scheme, the Pharmacy Defendants colluded with the Clinic Laypersons and the Prescribing Physicians to have the Prescribing Physicians intentionally prescribe, or purport to prescribe, the Fraudulent Pain Products to patients of the No-Fault Clinics pursuant to the Defendants' fraudulent predetermined protocols, without regard for genuine patient care, without regard for cost and attention to fiscal responsibility, and often without regard for pharmacologic outcomes.

188.     The Prescribing Physicians had no legitimate medical reason to prescribe the Fraudulent Pain Products in significant quantities to their patients.

189.     The Prescribing Physicians, including Davidov, prescribed, or purported to prescribe, many of the Fraudulent Pain Products to patients of the No-Fault Clinics using the formulaic, coded "prescriptions" that contain preprinted labels or rubber stamps with the name and formula of one of the Fraudulent Compounded Pain Creams produced and dispensed by Bliss Drugs.

190.     The Prescribing Physicians, including Davidov, prescribed, or purported to prescribe, the Fraudulent Pain Products to patients of the No-Fault Clinics, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; that the Fraudulent Compounded Pain Creams were not customized or tailored to the individual needs of a particular patient; that the Fraudulent Pain Products were often being prescribed without regard to pharmacologic outcomes; that the Fraudulent Pain Products were often prescribed with gross indifference to patient care and safety; and that the Fraudulent Pain Products were prescribed without attention to cost and fiscal responsibility given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

191.     In order to ensure that the prescriptions were filled by Bliss Drugs and to ensure that the Pharmacy Defendants benefitted financially from the prescriptions, the Prescribing Physicians virtually never gave the Insureds the option to use a pharmacy of their choosing, rather the Prescribing Physicians directed the prescriptions for the Fraudulent Pain Products to Bliss Drugs, notwithstanding that (i) in many instances the Prescribing Physicians and the

patients are located far from Bliss Drugs in Sunnyside, New York; and (ii) there are countless other pharmacies located much closer to the Prescribing Physicians and the patients.

192.    The Prescribing Physicians directed the prescriptions for the Fraudulent Pain Products to Bliss Drugs because the prescriptions were only being issued because of the illegal, collusive arrangements between the Pharmacy Defendants and the Prescribing Physicians. Any prescriptions that may be filled through other pharmacies was done so only to evade detection by GEICO of the fraudulent treatment protocol, or pursuant to a separate fraudulent scheme.

193.    Bliss Drugs purported to mail or deliver the Fraudulent Pain Products directly to the patients at the No-Fault Clinics where the patients were purportedly being treated.

194.    In actuality, the Insureds were often given the Fraudulent Pain Products by the front desk staff at the various No-Fault Clinics, in many cases, without even knowing that they were to receive one or more of the Fraudulent Pain Products.

195.    The Prescribing Physicians had no legitimate medical reason to prescribe the predetermined, medically unnecessary Fraudulent Pain Products in large quantities to their patients.

196.    The Prescribing Physicians would not have engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including using preprinted labels and rubber stamps distributed by the Pharmacy Defendants, intentionally prescribing medically unnecessary Fraudulent Pain Products, and directing those prescriptions to Bliss Drugs, unless they profited from their participation in the illegal scheme.

197.    But for the payments of kickbacks, or other financial incentives from the Pharmacy Defendants, the Prescribing Physicians would not have prescribed the Fraudulent Pain Products and would not have directed the prescriptions to Bliss Drugs.

198.    The Pharmacy Defendants and the Prescribing Physicians affirmatively concealed the particular amounts paid for the kickbacks because such kickbacks are in violation of New York law.

199.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Pharmacy Defendants paid a financial kickback or provide other financial incentives, and the Prescribing Physicians received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pain Products that were dispensed by Bliss Drugs. The payment of such kickbacks was made at or near the time the prescriptions were issued.

## G.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

200.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug, and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

201.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

202.    The maximum amount that a healthcare provider may charge for a medically necessary prescription drug or product is based upon the drug's NDC number. With respect to compounded products, the maximum that a healthcare provider may charge is based on each individual ingredient included in the compounded product and their corresponding NDC numbers and AWPs.

203.    The Pharmacy Defendants intentionally targeted prescription drugs with NDC numbers associated with extremely expensive assigned AWPs, in order to inflate the billing and maximize their profits.

204.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

205.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

206.    AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

207.    When a pharmacist bills for dispensing prescription drugs (including compounded products), it must bill based on the actual NDC number (and the assigned AWP) for that drug or compound drug ingredient. It cannot use the NDC of the same ingredient available from a different supplier and/or purchased in different quantities in order to inflate the assigned AWP.

208.    The Pharmacy Defendants purported to provide the Fraudulent Pain Products, including the Fraudulent Compounded Drugs, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms. With regard to compounded products, Bliss Drugs' bills list each ingredient separately

50

along with the corresponding charge for each. The total billed amount for Bliss Drugs' compounded products ranges as high as $1,520.00 for a single prescription.

209.   In support of its charges, the Pharmacy Defendants submitted: (i) the Prescribing Physicians' prescription forms, bearing the pre-printed or rubber-stamped name and formula of the prescription drug or compounded drug product; (ii) a "No-Fault" form, known as an NF-3 Form, which includes the purported NDC numbers, units, and corresponding charges for each drug or ingredient in the billed-for Fraudulent Compounded Drugs; (iii) an invoice from the Pharmacy Defendants listing the quantities of the drug or ingredients in the Fraudulent Compounded Drugs, the name of the Prescribing Physician, and the total amount due; and (iv) the AOB in which the Insured assigned their benefits to the Pharmacy Defendants.

210.   The NDC numbers listed on the NF-3 Forms submitted by the Pharmacy Defendants identify the AWPs for each of the prescriptions drugs or compound drug ingredients contained within the Fraudulent Compounded Drugs.

211.   Notably, however, the Pharmacy Defendants never submitted its purchase invoices demonstrating how much the Pharmacy Defendants paid the supplier for the ingredients or the quantities in which the ingredients were obtained.

212.   In fact, the Pharmacy Defendants never actually paid the targeted and egregious assigned AWP of the Fraudulent Pain Products that they dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pain Products.

213.   Further, the Pharmacy Defendants, purely to exploit the No-Fault reimbursement regulations relating to pharmaceutical products, intentionally assembled numerous individual drug ingredients with expensive AWPs to produce each of the Fraudulent Compounded Drugs.

214.    The combination of numerous drugs in each of the Fraudulent Compounded Drugs have no proven, documented superior efficacy than commercially available, FDA products available at a fraction of the cost.

215.    The sole reason for the Pharmacy Defendants' intentional assembling of large combinations of drugs was to inflate the charges and maximize their billing to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product.

**H.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO**

216.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Bliss Drugs seeking payment for the pharmaceuticals for which it is ineligible to receive payment.

217.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pain Products were medically necessary. In fact, the Fraudulent Pain Products were not medically necessary, were prescribed and dispensed without genuine regard for patient care, and the Pharmacy Defendants produced and dispensed the Fraudulent Pain Products pursuant to predetermined fraudulent treatment protocols solely to financially enrich themselves, without regard for the topical efficacy of the Fraudulent Pain Product or the availability of a wide range of commercially available, FDA-approved medications or OTC medications proven to have therapeutic effects available at a fraction of the cost.

(ii)    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants complied with all material licensing laws and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing laws in that the Defendants participated in illegal, collusive agreements in which the Pharmacy Defendants solicited and received formulaic and medically unnecessary

prescriptions from licensed medical professionals for the Fraudulent Pain Products produced by Bliss Drugs, in violation of law; and

(iii)     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants complied with all material licensing laws and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing laws in that they engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering the Pharmacies ineligible to receive reimbursement for No-Fault insurance benefits.

**I.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

218.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

219.    To induce GEICO to promptly pay the charges for the Fraudulent Compounded Drugs, the Defendants have gone to great lengths to systematically conceal their fraud.

220.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the Defendants (i) violated licensing laws governing manufacturers and large-scale drug outsourcing facilities of compounded drugs; (ii) have been involved in collusive, kickback arrangements to generate voluminous prescriptions pursuant to fraudulent predetermined treatment and billing protocols, without regard to genuine patient care; (iii) prescribed and dispensed Fraudulent Pain Products that have no efficacious value and grossly exceed the cost of effective FDA-approved medications; and (v) intentionally assembled large combinations of drugs into purported compounded pain creams solely to inflate the billing to GEICO and other New York insurance companies.

221.    In accordance with the No-Fault Laws, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through Bliss Drugs; (ii) timely issued requests for additional verification with respect to the pending claims for No-Fault Benefits submitted through Bliss Drugs, yet failed to obtain complete compliance with the requests for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through Bliss Drugs, or to request additional verification of those claims, has not yet expired.

222.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, Bliss Drugs continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Bliss Drugs has been engaged in fraud.

223.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $90,000 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $270,000.00.

224.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

225.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

226.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $450,000.00 in fraudulent billing for the Fraudulent Pain Products that Bliss Drugs has submitted to GEICO.

227.    Bliss Drugs has no right to receive payment for any pending bills submitted to GEICO because:

(i)     the Defendants made false and fraudulent misrepresentations to GEICO in that the Fraudulent Pain Products were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent treatment protocols designed solely to financially enrich themselves, based on prescriptions solicited by Bliss Drugs without regard for the topical efficacy of the Fraudulent Pain Products or the availability of a wide range of commercially available, FDA-approved medications or proven over-the-counter ("OTC") medications shown to have therapeutic effects available at a fraction of the cost;

(ii)    the Defendants engaged in illegal, collusive agreements in which Bliss Drugs solicited and received formulaic and medically unnecessary prescriptions from the Prescribing Physicians for the Fraudulent Pain Products, including the Fraudulent Compounded Drugs, produced and dispensed by Bliss Drugs in violation of law; and

(iii)   the Pharmacy Defendants engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

228.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bliss Drugs has no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CAUSE OF ACTION
### Against Iskhakova
### (Violation of RICO, 18 U.S.C. § 1962(c))

229. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

230. Bliss Drugs is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

231. Iskhakova knowingly has conducted and/or participated, directly or indirectly, in the conduct of Bliss Drugs's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted over a thousand fraudulent charges on a continuous basis for over two years, seeking payments that Bliss Drugs was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and were billed pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants, based on "rubber-stamped" prescriptions solicited by Bliss Drugs without regard for the topical efficacy of the prescribed drugs or the availability of a wide range of commercially available, FDA-approved medications and OTC medications proven to have therapeutic effects available at a fraction of the cost; (ii) the Defendants participated in illegal, collusive agreements in which Bliss Drugs solicited and received formulaic and medically unnecessary prescriptions from the Prescribing Physicians for the Fraudulent Pain Products, including the Fraudulent Compounded Drugs produced by Bliss Drugs, in violation of law; and (iii) Bliss Drugs engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug

manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

232.    Bliss Drugs's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Iskhakova operated Bliss Drugs, inasmuch as Bliss Drugs never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Bliss Drugs to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit and attempt to collect on the fraudulent billing submitted through Bliss Drugs to the present day.

233.    Bliss Drugs is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault insurance system, engage in illegal, collusive arrangements involving medically unnecessary pain products, including compounded drugs, and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Bliss Drugs in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

234.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $90,000.00 pursuant to the fraudulent bills submitted through Bliss Drugs.

235.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRD CAUSE OF ACTION**
**Against Iskhakova and Davidov**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

236.     GEICO incorporates, as though fully set forth herein, each and every allegation in
the paragraphs set forth above.

237.     Bliss Drugs is an ongoing "enterprise", as that term is defined in 18 U.S.C. §
1961(4), that engages in activities which affect interstate commerce.

238.     Iskhakova and Davidov are employed by and/or associated with the Bliss Drugs
enterprise.

239.     Iskhakova and Davidov knowingly have agreed, combined and conspired to
conduct and/or participate, directly or indirectly, in the conduct of the Bliss Drugs enterprise's
affairs, through a pattern of racketeering activity consisting of repeated violations of the federal
mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or
cause to be submitted over a thousand fraudulent charges on a continuous basis for over two
years seeking payments that Bliss Drugs was not eligible to receive under the No-Fault Laws
because: (i) the billed-for services were not medically necessary and were billed pursuant to a
predetermined fraudulent protocol solely to financially enrich the Defendants, based on "rubber-
stamped" prescriptions solicited by Bliss Drugs without regard for the topical efficacy of the
prescribed drugs or the availability of a wide range of commercially available, FDA-approved
medications and OTC medications proven to have therapeutic effects available at a fraction of
the cost; (ii) the Defendants participated in illegal, collusive agreements in which Bliss Drugs
solicited and received formulaic and medically unnecessary prescriptions from the Prescribing
Physicians for the Fraudulent Pain Products, including the Fraudulent Compounded Drugs
produced by Bliss Drugs, in violation of law; and (iii) Bliss Drugs engaged in illegal bulk

compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

240.    Iskhakova and Davidov knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

241.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $90,000.00 pursuant to the fraudulent bills submitted by the Defendant Bliss Drugs.

242.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE FOURTH CAUSE OF ACTION
**Against Iskhakova and Bliss Drugs**
**(Common Law Fraud)**

243.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

244.    Iskhakova and Bliss Drugs intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pain Products.

245.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were

medically necessary and properly billed in accordance with the Pharmacy Fee Schedule, when in fact the billed-for services were not medically necessary and were billed pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants, based on "rubber-stamped" prescriptions solicited by Bliss Drugs without regard for the topical efficacy of the prescribed drugs or the availability of a wide range of commercially available, FDA-approved medications or OTC medications proven to have therapeutic effects available at a fraction of the cost; (ii) in every claim, the representation that Bliss Drugs was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive agreements in which Bliss Drugs solicited and received formulaic and medically unnecessary prescriptions from licensed physicians and/or their associates for the Fraudulent Pain Products, including the Fraudulent Compounded Drugs produced by Bliss Drugs, in violation of law; and (iii) in every claim, the representation that Bliss Drugs was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Bliss Drugs engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

246.    Iskhakova and Bliss Drugs intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bliss Drugs that were not compensable under the No-Fault Laws.

247.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $90,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Bliss Drugs.

248.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

249.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE FIFTH CAUSE OF ACTION**
**Against Davidov**
**(Aiding and Abetting Fraud)**

250.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

251.     Davidov knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Iskhakova and Bliss Drugs.

252.     The acts of Davidov in furtherance of the fraudulent scheme include knowingly purporting to prescribe the Fraudulent Pain Products, including the Fraudulent Compounded Drugs, and permitting their names to be used in the billing, prescription records and treatment reports submitted in support of the Fraudulent Compounded Drugs despite their knowledge that Bliss Drugs was ineligible to bill for or to collect No-Fault Benefits in connection with the Fraudulent Pain Products because: (i) the Defendants produced, prescribed, and/or dispensed the Fraudulent Pain Products pursuant to predetermined fraudulent treatment protocols solely to financially enrich themselves, based on prescriptions solicited by Bliss Drugs without regard for the topical efficacy of the drugs or the availability of a wide range of commercially available,

FDA-approved medications and OTC medications proven to have therapeutic effects available at a fraction of the cost; (ii) the Defendants participated in illegal, collusive agreements in which Bliss Drugs solicited and received formulaic and medically unnecessary prescriptions from licensed physicians and/or their associates for the Fraudulent Pain Products, including the Fraudulent Compounded Drugs produced by Bliss Drugs, in violation of law; and (iii) Bliss Drugs engaged in illegal bulk compounding by specializing in creating and dispensing large quantities of the Fraudulent Compounded Drugs in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

253.    The conduct of Davidov in furtherance of the fraudulent scheme was significant and material. The conduct of Davidov was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Bliss Drugs to obtain payment from GEICO and from other insurers.

254.    The Prescribing Physicians aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Bliss Drugs for medically unnecessary and illusory Fraudulent Pain Products that were not compensable under the No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

255.    The conduct of Davidov caused GEICO to pay approximately $90,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Bliss Drugs.

256.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

257.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE SIXTH CAUSE OF ACTION
### Against Iskhakova and Bliss Drugs
### (Unjust Enrichment)

258.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

259.    As set forth above, Iskhakova and Bliss Drugs have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

260.    When GEICO paid the bills and charges submitted by or on behalf of Bliss Drugs for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

261.    Iskhakova and Bliss Drugs have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

262.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

263.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $90,000.00.

## JURY DEMAND

264.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Pharmacy Defendants have no right to receive payment for any pending bills, amounting to approximately $789,000.00 submitted to GEICO;

B.     On the Second Cause of Action against Iskhakova, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $90,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.     On the Third Cause of Action against Iskhakova and Davidov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $90,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.     On the Fourth Cause of Action against Iskhakova and Bliss Drugs, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $90,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against the Prescribing Physicians, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $90,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Claim for Relief against Iskhakova and Bliss Drugs, a recovery in favor of GEICO in an amount to be determined at trial but approximately $90,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
          October 16, 2020

RIVKIN RADLER LLP

By:    */s/ Michael A. Sirignano*
          Michael A. Sirignano
          Barry I. Levy
          Joshua D. Smith
          Colleen O'Neil
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*